**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER L. JONES, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | NO. 5:20-cv-00336-CAR-MSH |
| | : | |
| TIMOTHY WARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## ORDER AND RECOMMENDATION

Pending before the Court is Defendants' motion for summary judgment (ECF No. 337).  Also pending are Plaintiff Christopher Jones's motions for sanctions (ECF Nos. 328, 333) and motion for summary judgment (ECF No. 343).  For the reasons stated below, it is recommended that Defendants' motion for summary judgment be denied as to the retaliation claim against Defendant Ward but otherwise granted.   Jones's motions for sanctions are denied without prejudice.   It is recommended his motion for summary judgment also be denied.

### PROCEDURAL BACKGROUND

Jones's claims arise from his transfer from Autry State Prison ("ASP") in Pelham, Georgia, to Macon State Prison ("MSP") and subsequent placement in the MSP Tier II program.   After numerous amendments and preliminary screening, the following claims by Jones remain pending: (1) a First Amendment retaliatory transfer claim against Defendants Ward and Crickmar; (2) a procedural due process claim against Ward, Crickmar, Perry, Nelson, Jackson, Whitehead, Freeman, Patterson, and Kegler; (3) a

conditions of confinement claim related to alleged unsanitary conditions in MSP Tier II against Perry, Eaddie, McKenzie, Jackson, Pope, Whitehead, and Kegler; (4) a conditions of confinement claim related to lack of recreation time at MSP against Perry, Eaddie, McKenzie, Jackson, Whitehead, Kegler, and Freeman; and (5) a deliberate indifference to a serious medical need claim against Perry, McKenzie, Eaddie, and Schofill.[1]   Defendants filed their motion for summary judgment on May 22, 2023 (ECF No. 337).   Jones responded on June 22, 2023 (ECF No. 347).   Jones also filed a motion for summary judgment, and Defendants responded on July 6, 2023 (ECF Nos. 343, 352).   Defendants filed a reply on July 10, 2023 (ECF No. 353).   These motions are ripe for review.

## I.   Defendants' Motion for Summary Judgment

Defendants move for summary judgment, arguing Jones (1) failed to exhaust his administrative remedies on his conditions of confinement claims; (2) cannot establish a First Amendment retaliation claim, due process claim, conditions of confinement claim, or deliberate indifference to a serious medical need claim; (3) cannot establish supervisory liability; (4) cannot recover compensatory damages because he suffered no actual physical injuries; and (5) cannot show Defendants are not entitled to qualified immunity.   Defs' Br. in Supp. of Mot. for Summ. J. 16-36, ECF No. 337-17.

### A.   Summary Judgment Standard

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[1]   Defendant Eaddie has been mistakenly referred to as "Eddie" in the pleadings.   The Clerk is **DIRECTED** to amend the docket to reflect the correct spelling of his name.

of law." Fed. R. Civ. P. 56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.   *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law.   *Id.* at 324-26.   This evidence must consist of more than conclusory allegations.   *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).   In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.

B.   <u>Undisputed Material Facts</u>

On September 4, 2018, there was an incident at ASP in which many inmates

conducted a "sit-in" and refused to report to their work assignments and refused to go to lockdown when ordered, resulting in the deployment of tear gas.   Crickmar Decl. ¶¶ 4-5, ECF No. 337-2.   Numerous inmates were immediately identified as being part of the sit-in and/or participation in the refusal to go to lockdown and were transferred out of ASP to other prisons.[2]   *Id.* at pp. 22-24.   Jones was not one of those identified as participating in the disturbance.   On September 10, 2018, Defendant Ward—who was the Assistant Commissioner of the Georgia Department of Corrections ("GDC") and Chief of Staff to the Commissioner—and Defendant Crickmar—the Southwest Regional Director for the GDC—visited ASP to check on its status and ensure that all participants in the disturbance had been transferred from the facility.   *Id.* ¶¶ 3, 6; Ward Decl. ¶¶ 3, 5, ECF No. 337-1. During the inspection, Jones, who was a dorm representative, approached Ward and handed him a letter complaining about the conditions of confinement at ASP.[3]   4th Am. Compl. 3, ECF No. 266-1; Pl's Notice of Filing, ECF No. 329.   Ward looked briefly at the letter, handed it to an unidentified official, and ordered that Jones be placed in handcuffs, removed from the facility, placed in restrictive housing, and interviewed by an investigator. 4th Am. Compl. 3; Crickmar Decl. ¶¶ 7, 9; Ward Decl. ¶¶ 6-8; Bish Decl. p. 25, ECF No. 337-3.   A few hours later, while Jones was still at ASP, Ward came to speak with Jones

---

[2]   The Court notes Defendants submitted witness declarations and their corresponding exhibits as one document as opposed to separate attachments to the declarations.   To avoid confusion, the Court refers to the witness declarations by the paragraph number and the attachments by the page number.

[3]   According to Jones, the GDC custom is to have an inmate dorm representative who meets once a month with the Warden or other prison administrator.   4th Am. Compl. 3.   Because Jones's fourth amended complaint complies with 28 U.S.C. § 1746, it "may substitute for a sworn affidavit at the summary judgment stage."   *Roy v. Ivy*, 53 F.4th 1338, 1344, 1347-48 (11th Cir. 2022).

and accused him of having sent the letter-petition to the media.   4th Am. Compl. 3.   He also told Jones he would "throw [him] in the hole for a year at least."   *Id.*   That evening, Jones was transferred to MSP.   *Id.*

The next day, GDC Inspector Chris Bish interviewed Jones at MSP for three hours. Bish Decl. ¶ 6.   Bish prepared an email summary of his interview with Jones, stating Jones told him he prepared the letter-petition at the request of the organizer of the September 4, 2018, sit-in, who was known as "Yea Man" and described in Bish's email as "the main Muslim leader."   *Id.* at p. 25.   Bish also reported Jones told him the sit-in was triggered by implementation of the "WCS" system which interfered with the Muslims' contraband smuggling operation and caused them to lose money.   *Id.* at pp. 25-26.   According to Bish, Jones "admitted culpability in the Muslim orchestrated scams and later admitted his involvement in contraband introduction into [Phillips State Prison ("PSP")] while working [there] as a maintenance orderly."   *Id.* at p. 26.   Jones also purportedly identified the location of a weapons cache in his dorm at ASP.   *Id.*   Bish reported Jones made three requests at the end of the interview, including a return to PSP where he could work, a letter to the parole board describing his assistance, and a request he not be prosecuted for his criminal actions while an inmate in GDC.   *Id.*   Bish stated in his email that a copy of the letter-petition would be attached to a "forthcoming investigative summary," but the letter-petition has not been produced in discovery and GDC cannot account for its location.   Bish Decl. p. 25.   Following the interview, Bish sent his email to various GDC officials, including Crickmar and Robert Toole, the Director of Field Operations, who ordered that

Jones remain in the Tier II program at MSP.[4]   *Id.* at pp. 25-26.   Crickmar relayed this instruction directly to Defendant Perry—the Warden of MSP.   *Id.*

The GDC Standard Operating Procedure ("SOP") for the Tier II program states it was "established to protect staff, offenders, and the public from offenders, who commit or lead others to commit violent, disruptive, predatory, or riotous actions, or who otherwise pose a serious threat to the safety and security of the institutional operation."   Nelson Decl. p. 6, ECF No. 337-5.   It is described as "part of a comprehensive facility-wide stratification plan that will manage the institutional conduct and programmatic need of the assigned population."   *Id.*   It is a three-phase program in which an inmate's progress is determined by his behavior and ability to meet the goals of his individualized case plan. *Id.* at p. 8.   The program is incentive-based, with the privileges enjoyed by an inmate in Tier II increasing as he progresses.   *Id.*; *see* Perry Decl. p. 38, ECF No. 337-4 (outlining conditions and privileges of each phase of the Tier II program).   There are thirteen criteria for placement in Tier II, and an inmate must meet at least one of them to be eligible for the program.   Nelson Decl. pp. 9-10.   One criterion is being "a threat to the safe and secure operation" of a prison, including membership in a Security Threat Group ("STG"), while another is "[p]articipation as a leader or involvement in a major disruptive event [or] major disturbance."   *Id.*

A classification committee reviews recommendations for an inmate's placement in

---

[4]   The evidence shows Bish did not send his email summary directly to Ward.   *See* Pl.'s Mot. for Sanctions Ex. 1, ECF No. 275-1 (Bish responding "negative" when asked if he forwarded his summary to Ward, stating "Mr. Crickmar advised Mr. Toole would send up their chain[.]").

Tier II and submits its recommendation to the Warden for approval or disapproval.   *Id.* at

p. 10.   In emergency situations, however, the Warden may authorize immediate

assignment of an offender to the Tier II program.   *Id.* at p. 11.   Once assigned to Tier II,

the classification holds an administrative hearing within ninety-six hours.   *Id.* at p. 10.

An offender may appeal his assignment to Tier II to the Director of Field Operations or his

or her designee.   *Id.* at p. 11.   The classification committee shall also conduct ninety-day

reviews, and those findings may also be appealed.   Nelson Decl. pp. 13-15.

On September 13, 2018, the MSP Tier II classification committee conducted the 96-

hour administrative hearing for Jones's placement.   *Id.* ¶ 13, p. 33.   This initial

classification committee consisted of Defendants Kegler and Patterson and another

unidentified MSP official.   Patterson Decl. ¶ 4, ECF No. 337-9; Kegler Decl. ¶ 4, ECF

No. 337-10; Nelson Decl. p. 27.   Kegler was a Unit Manager on Tier II, and Patterson was

a counselor.   Kegler Decl. ¶ 3; Patterson Decl. ¶ 3.   The Tier II process was explained to

Jones, and he was given a memo explaining the conditions and privileges of Tier II, allowed

to ask questions, and given an appeal form.   Nelson Decl. p. 33.   The initial segregation

review assignment recommendation, signed by members of the classification committee,

listed the reason for Jones's assignment:

> The offender is a threat to the safe and secure operation of the facility.   He
> is STG G-Shyne.   He was transferred from Autry State Prison to be placed
> on Tier II status due to participation in a major disturbance on 9/10/18, per
> Regional Director Mr. Scott Crickmar.

*Id.* at pp. 26-27.   Perry approved the assignment the next day.   Perry Decl. p. 23.   Jones

was served with the assignment memo on September 26, 2018, and timely appealed.   *Id.*

at pp. 24, 28.   In his appeal, Jones contended he was never a threat to the operation of ASP, was not a member of STG G-Shyne, and did not participate in a major disturbance, stating his only action was writing a letter complaining about the conditions at ASP.   *Id.* at p. 28.   Defendant Nelson, the Statewide Tier Manager, reviewed the appeal, and after discussions with Perry and Crickmar, denied the appeal as the designee for the Director Field Operations.   *Id.* ¶¶ 3, 17-18, p. 32.

Jones progressed through the Tier II program, and at each 90-day review, he was promoted to the next phase.   Perry Decl. ¶ 9.   He entered phase III on March 18, 2019, and transferred out of the Tier II at MSP to Dooly State Prison on June 20, 2019, after being in the program for nine months.   *Id.* ¶¶ 10-11.   Throughout this time, Jones continued to appeal his placement in the Tier II program, maintaining he was never a threat to the secure operation of ASP, denying he participated in a major disturbance—which he pointed out occurred on September 4, 2018, and not September 10, 2018—and contending his assignment was a pretext in retaliation for his presenting the letter of grievances.   *Id.* at p. 31.

While Jones was housed in MSP Tier II, fellow inmates would intentionally clog their toilets, causing raw sewage to flood the cells.   4th Am. Compl. 6.   When the flooding would occur during the night shift, the staff would leave the sewage overnight. *Id.*   There were occasions when the sewage was allowed to remain twelve to twenty hours without being cleaned.[5]   Hr'g Tr. 133, ECF No. 325.   In contrast, Jones reported the day

---

[5]   As part of its effort to resolve the parties' discovery disputes, the Court held a hearing on March 23, 2023, in which all but one Defendant testified.

shift was "good" about cleaning, and on the occasions sewage was left overnight, first shift would have the cells cleaned.   *Id.* at 76, 132.

In addition, although the Tier II SOP required inmates to be offered a minimum of five hours per week of out-of-cell exercise, the staff would in fact rarely offer it.   4th Am. Compl. 8-9.   Finally, because of his placement in Tier II, Jones was told he could not have batteries for his prescribed pain-management device ("TENS unit"), an eggcrate foam pad, or access to physical therapy.   *Id.* at 10.   Jones had been diagnosed with a herniated disc. *Id.*

C.   Exhaustion

Defendants contend Jones failed to exhaust his administrative remedies on his conditions of confinement claims.   Defs.' Br. in Supp. of Mot. for Summ. J. 23-25.   The Court disagrees except as to Jones's allegations regarding physical therapy.

*1.   Exhaustion Standard*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   When a grievance procedure is provided for prisoners, "an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure *before* pursuing a § 1983 lawsuit."   *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2000) (emphasis added). "To exhaust administrative remedies in accordance with the PLRA, prisoners must properly take each step within the administrative process.   If their initial grievance is

denied, prisoners must then file a timely appeal." *Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008) (internal citation and quotation marks omitted).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). However, a district court "may not enforce a prison's procedural rule to find a lack of exhaustion after the prison itself declined to enforce the rule." *Whatley v. Warden, Ware State Prison* ("*Whatley I*"), 802 F.3d 1205, 1215 (11th Cir. 2015).  Therefore, "a prisoner has exhausted his administrative remedies when prison officials decide a procedurally flawed grievance on the merits." *Id.*  Accordingly, to fully evaluate a defendant's exhaustion defense, the Court must look "to the prison's response at the final level of administrative review." *Whatley v. Smith* ("*Whatley II*"), 898 F.3d 1072, 1084 (11th Cir. 2018).

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).  "The critical function of the grievance process is that it provides the institution with notice of a problem such that they have an opportunity to address the problem internally." *Toenniges v. Ga. Dep't of Corr.*, 600 F. App'x 645, 649 (11th Cir. 2015) (per curiam).

"Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the

proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."[6]  *Bryant*, 530 F.3d at 1374-75 (internal quotation marks omitted).   Further, since dismissal for failure to exhaust is not an adjudication on the merits, the Court can resolve factual disputes using evidence from outside the pleadings.   *Id.* at 1376.   "[D]eciding a motion to dismiss for failure to exhaust administrative remedies is a two-step process."  *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008).   "First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's versions of the facts as true."  *Id.*   If, taking plaintiff's facts as being true, the defendant is entitled to dismissal for failure to exhaust, then the complaint should be dismissed.  *Id.*   "If the complaint is not subject to dismissal at the first step . . . the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion."  *Id.*   The defendant bears the burden of proof during this second step.  *Id.*   In resolving the factual dispute, a Court is authorized to make credibility determinations.   *See Bryant*, 530 F.3d at 1377-78 (finding that district court did not clearly err in determining that plaintiff's allegation that he was denied access to grievance forms was not credible); *see also Whatley II*, 898 F.3d at 1082-83 (upholding district court finding that one of inmate's grievances was not filed).

A prisoner need only exhaust administrative remedies that are available.   *Ross v. Blake*, 578 U.S. 632, 642 (2016).   In *Ross*, the Supreme Court held that an administrative

---

[6]  Such is the case here.   Therefore, although Defendants argue exhaustion in a summary judgment motion, it will be treated as if raised in a motion to dismiss.

procedure is unavailable under the PLRA when either (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) it is "so opaque that it becomes, practically speaking, incapable of use," or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44. For a remedy to be available, it "must be capable of use for the accomplishment of its purpose." *Turner*, 541 F.3d at 1084 (quotation marks omitted). The burden is on the defendant to show that an administrative remedy is available, but "once that burden has been met, the burden of going forward shifts to the plaintiff, who . . . must demonstrate that the grievance procedure was subjectively and objectively unavailable to him." *Geter v. Baldwin State Prison*, 974 F.3d 1348, 1356 (11th Cir. 2020) (internal quotation marks omitted) (citing *Turner*, 541 F.3d at 1085). District courts must use the two-step *Turner* analysis when addressing the availability of the grievance process. *See Jenkins v. Sloan*, 826 F. App'x 833, 839 (11th Cir. 2020) (per curiam) (directing district courts to apply "the two-step *Turner* test when addressing the question of exhaustion and the *availability* of the grievance process").

### 2.    MSP Administrative Procedures

Defendants have submitted the affidavit of Curtis Jeffries—the Deputy Warden of Care and Treatment and former Chief Counselor at MSP—to establish that administrative remedies were available to Jones at MSP. Jeffries Decl. ¶¶ 2-3, ECF No. 337-15. Jeffries's responsibilities include administering the grievance process at MSP, and he is familiar with how records of grievances are maintained. *Id.* According to Jeffries, MSP follows the GDC Standard Operating Procedures SOPs regarding grievances. *Id.* ¶ 3.

The SOPs mandate that an inmate must follow a two-step process to exhaust his remedies: (1) file an original grievance no later than ten days from the date the inmate knew or should have known of the facts giving rise to the grievance; and (2) file an appeal to the Central Office.   *Id.* at p. 14.   The warden has forty calendar days to respond to an original grievance, though a one-time, ten-day extension may be granted.   *Id.*   at p. 17.   An inmate may file an appeal within seven days after the warden issues a decision or after the time allowed for the warden to decide expires.   *Id.* at p. 18.   The Commissioner has one hundred and twenty days within which to respond to a grievance appeal.   Jeffries Decl. p. 19.   With certain exceptions not applicable here, an inmate "may file a grievance about any condition, policy, procedure, or action or lack thereof that personally affects the [inmate]."   *Id.* at p. 11.   An inmate is limited to two active grievances, and the Warden should reject a grievance if it raises more than "one issue/incident."   *Id.* at pp. 12, 15.

### 3.   *Plaintiff's Grievances*

Jones filed two grievances on April 15, 2019, related to cell flooding.   The first was Grievance Number 2817162, wherein Jones complained about "prolonged biohazard exposure" and cited as examples one incident occurring on April 9, 2019, and another incident occurring on April 14, 2019.   Jeffries Decl. p. 56.   In both instances, Jones stated inmates threw feces and flooded the dorm.   *Id.*   He also claimed his dorm was exposed to sewage for twenty hours by being left overnight.   *Id.*   The Warden rejected the grievance on May 17, 2019, because it contained more than one "issue/incident."   *Id.* at p. 57.   Jones was notified of the decision on May 23, 2019, and appealed on June 19, 2019, contending he was only grieving one issue—prolonged biohazard exposure—and only cited the two

incidents as examples.[7]   *Id.* at pp. 55, 57.   The Central Office upheld the grievance denial due to it containing "more than one issue."   *Id.* at p. 54.

Jones's second grievance mentioning cell flooding was Grievance Number 288694, wherein he cited the same flooding incidents and claimed staff allowed the sewage to sit overnight as a form of "group punishment."   Jeffries Decl. p. 63.   He also claimed the entire dorm was punished with "denial of shower, yard[, and] phone access on April 15, 2019."   *Id.*   He alleged "[g]roup punishment is a weekly occurrence."   *Id.*   This grievance was also denied for containing more than one "issue/incident," and the Central Office upheld the denial because it "noted more than one issue."   *Id.* at pp. 61, 64.

Jones filed one grievance—Grievance Number 278830—related to lack of out-of-cell recreation.   On November 19, 2018, Jones stated MSP staff were not complying with GDC SOPs requiring a minimum of five hours per week of out-of-cell exercise.   *Id.* at p. 48.   Jones stated the "depravation [sic] was ongoing," and he had only "had recreation time twice" since arriving at MSP on September 10, 2018.   *Id.*   The Warden denied the grievance as untimely.   Jeffries Decl. p. 49.   Jones appealed, and in the appeal response, the Central Office stated, "This grievance was filed out of time and was rejected at the institutional level in accordance with policy.   However, the issue will be addressed administratively.   Based on this information, your grievance is denied."   *Id.* at p. 46.

### 4.   *Analysis*

Defendants contend Jones failed to exhaust his administrative remedies because he

---

[7]   This appeal was not filed within seven days of Jones's receipt of the Warden's decision, but the Central Office did not reject the appeal on this basis.

did not "properly exhaust" by complying with the grievance procedures.   Defs.' Br. in Supp. of Mot. for Summ. J. 25.

The Court concludes Jones exhausted his administrative remedies on his unsanitary conditions and out-of-cell recreation claims to the extent they were available.   Regarding the cell-flooding, the Court notes the final Central Office appeal response to Grievance Number 2817162 did not rely on there being more than one "incident" alleged, but only that more than one "issue" was raised.   Jeffries Decl. p. 61. Thus, the Court need not determine whether Jones's listing of two separate occasions of flooding amounted to raising two "incidents" in violation of GDC policy and whether denial on such grounds would render his administrative remedy unavailable.   However, Jones's grievance clearly raises only one "issue"—cells being flooded with sewage.   Thus, denial on the grounds it raised more than one issue effectively rendered the remedy unavailable.   *See Wilson v. Danforth*, No. CV 316-040, 2017 WL 9482458, at *4 (S.D. Ga. Dec. 19, 2017) (denying motion to dismiss for failure to exhaust where grievance was improperly denied for raising more than one issue), *recommendation adopted by* 2018 WL 496997 (S.D. Ga. Jan. 22, 2018); *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1247-48 (N.D. Fla. 2019) (finding administrative remedy unavailable where grievance was improperly rejected for failing to comply with the one issue rule).

Regarding the out-of-cell recreation grievance, the Court finds Jones exhausted his administrative remedies for two reasons.   For one, it appears prison officials waived the procedural flaw.   In the Central Office appeal response, it acknowledged rejection of the grievance at the institutional level in "accordance with policy," but then seemed to qualify

this rejection, stating "[h]owever, the issue will be addressed administratively," before denying the grievance.   Jeffries Decl. p. 46.   Because the purpose of the prison grievance procedures is to provide an administrative remedy, this statement implies prison officials denied Jones's grievance on the merits, thus waiving any procedural flaw.   *Whatley I*, 802 F.3d at 1215.   In addition, Jones alleged an ongoing failure to provide him with out-of-cell recreation time, so it is unclear why his grievance was deemed untimely.[8]   *See McIlwain v. Burnside*, 830 F. App'x 606, 611 (11th Cir. 2020) (per curiam) (reversing district court when it did not explain why the plaintiff's grievance was untimely when he alleged an ongoing failure to treat his injuries).   If Defendants' explanation was accepted, then seemingly they could have denied Jones out-of-cell recreation for the first ten days of his confinement in Tier II and, if he did not file a grievance in that period, had free rein to deny it for the remainder of his time in Tier II.

The Court, however, reaches a different conclusion on Jones's claim he was denied physical therapy.   He admits he was unable to file a grievance about access to physical therapy because he already had two active grievances.   4th Am. Compl. 12.   He states he attempted to file a grievance, but it was rejected because of this restriction.   *Id.*   He was told he had to drop one of his two pending grievances to file another one.   *Id.*   It is not clear if Jones alleges this rendered his administrative remedies unavailable for this claim, but "courts have consistently held that this limitation does not render the grievance process

---

[8]   The Court notes the computer-generated summary of Jones's grievance improperly identifies the date of his arrival in MSP Tier II as "September 10, 2015," so it is possible prison officials were mistaken as to when the alleged the denial of out-of-cell recreation began.   Jeffries Decl. p. 44.

unavailable under *Ross*."   *Blackwell v. Gardner*, No. 5:19-cv-2-MTT, 2020 WL 1529363, at *1 (M.D. Ga. Mar. 30, 2020) (collecting cases).   Therefore, the Court recommends Jones's claims as it pertains to physical therapy be dismissed for failure to exhaust.

D.   <u>Retaliation</u>

Jones contends his transfer to MSP constituted retaliation in violation of his First Amendment rights.   4th Am. Compl. 3-4.   Ward and Crickmar are defendants on this claim.   Order 2, Mar. 17, 2023, ECF No. 296.   "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement."   *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).   A transfer in retaliation for exercising such rights violates the inmate's First Amendment rights.   *See Bridges v. Russell*, 757 F.2d 1155, 1156 (11th Cir. 1985).   To prove retaliation, a plaintiff must establish "(1) his speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech."   *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (internal quotation marks omitted). Whether the defendant's conduct adversely affected the protected conduct is an objective test as opposed to a subjective one requiring plaintiffs to prove the exercise of their First Amendment rights was "actually chilled."   *Bennett v. Hendrix*, 423 F.3d 1247, 1250-51 (11th Cir. 2005).   Instead, the Court applies an "ordinary firmness test," meaning the Court looks at whether the "retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."   *Id.* at 1250 (internal quotation marks

omitted).

"To establish causation, the plaintiff must show that the defendant was subjectively motivated to discipline the plaintiff for exercising his First Amendment rights." *Moton*, 631 F.3d at 1341 (internal quotation marks omitted).   The defendant's subjective motivation is determined by applying a "burden-shifting formula." *O'Bryant v. Finch*, 637 F.3d 1207, 1217 (11th Cir. 2011) (per curiam) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).   "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Mosley*, 532 F.3d at 1278 (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 399 (6th Cir.1999)).   "Then, 'if the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on his motion for summary judgment as a matter of law or prior to trial on summary judgment.'"   *O'Bryant*, 637 F.3d at 1217 (quoting *Mosley*, 532 F.3d at 1278).

Ward argues he would have transferred Jones even in the absence of the grievance letter because Jones identified himself as a leader of the September 4, 2018, ASP incident at the time he presented the letter, and Ward believed transferring Jones was necessary to maintain safety and security at ASP.   Defs.' Br. in Supp. of Mot. for Summ. J. 18; Ward Decl. ¶¶ 6, 9.   The problem with this argument, however, is Jones denies ever identifying himself as a leader or participant in the September 4, 2018, incident, and for purposes of summary judgment, the Court must assume this is true.[9]   Pl.'s Resp. to Mot. for Summ. J.

---

[9]   Jones states he only identified himself as the dorm representative per GDC custom.   Pl's Resp. to Defs.' Statement of Facts 2, ECF No. 347-1; *see* 4th Am. Compl. 3.

3, ECF No. 347.   Further, the version of the letter-petition submitted by Jones (ECF No. 329), which the Court also must assume is an accurate reproduction of what was presented to Ward, does not identify Jones as a leader of the incident.   Therefore, the evidence as it stands shows only that Jones presented a letter complaining about conditions at ASP, and in response, Ward immediately ordered his transfer.   To the extent Ward relies on Bish's summary of his interview with Jones, by the time that interview took place, Jones had already been transferred and placed in restrictive housing at MSP.   Crickmar Decl. ¶¶ 9, 12.   Therefore, assuming Jones's version of events is true, a constitutional violation had already occurred prior to Bish interviewing him.   Further, Ward is not entitled to qualified immunity because "[i]t is well-established that prison officials cannot retaliate against prison inmates for filing lawsuits or grievances in which the inmate complains about prison conditions."   *Holland v. McLaughlin*, No. 5:18-cv-178-MTT, 2021 WL 3561227, at *4 n.2 (M.D. Ga. Aug. 11, 2021) (rejecting argument that qualified immunity barred retaliation claim).

Regarding Crickmar, the Court reaches a different conclusion.   There is no evidence Crickmar played any part in the decision to transfer Jones to MSP or that he had any retaliatory intent.   Instead, the evidence shows it was Ward alone who ordered Jones transferred and placed in restrictive housing—whether it be specifically Tier II or other administrative segregation.   4th Am. Compl. 3; Hr'g Tr. 16; *see* Pl.'s Resp. to Defs.' Statement of Facts 4.   ("[T]he record of the case shows that the decision to place Plaintiff on Tier II was made on 9/10/18 by Defendant Ward.").   Then, following Bish's interview of Jones, Toole instructed Crickmar to keep Jones in Tier II, and Crickmar forwarded that

command to Perry.   Crickmar Decl. p. 25-26.   Other than being the messenger of these orders, there is no evidence Crickmar was responsible for Jones's transfer.   Therefore, while the Court recommends summary judgment be denied to Ward, it recommends it be granted to Crickmar.

        E.    <u>Due Process</u>

Jones also asserts a due process claim against Ward, Crickmar, Perry, Nelson, Jackson, Whitehead, Freeman, Patterson, and Kegler related to his placement and retention in Tier II.[10]   "To make out a denial-of-procedural-due-process claim under § 1983, a plaintiff must establish three elements: (1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Quintanilla v. Bryson*, 730 F. App'x 738, 743 (11th Cir. 2018) (per curiam) (citing *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).   Regarding the first element, an inmate has a liberty interest in avoiding imposition of "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."   *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).[11]   As for the third element, minimum due process requirements for an inmate deprived of a liberty interest for disciplinary reasons "are (1) advance written notice of the charges; (2) a written statement of the reasons for the disciplinary action taken; and (3) the opportunity to call witnesses and present evidence, when consistent with institutional safety and correctional goals."

---

[10]   Unless indicated otherwise, the Court's references to "Defendants" in this recommendation means those individuals who are identified as defendants on the particular claim being discussed.

[11]   The second element is not at issue in this case.

*Nolley v. McLaughlin*, No. 5:15-cv-00149-TES-CHW, 2018 WL 9538757, at *7 (M.D. Ga. Aug. 27, 2018).   Nevertheless, "[t]he mere failure . . . to allow an inmate to call witnesses to the hearing does not by itself violate protections offered by the Due Process clause.   The key inquiry is whether the inmate received notice of the reasons for the hearing and had a fair opportunity for rebuttal."   *Id.* (internal citation omitted).

When an inmate is assigned to administrative segregation, periodic review is also required, though "[t]his review will not necessarily require that prison officials permit the submission of any additional evidence or statements."   *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *overruled on other grounds by Sandin*, 515 U.S. at 483.   "Rather, prison officials may base their decisions on 'facts relating to a particular prisoner,' their 'general knowledge of prison conditions and tensions,' and other 'administrative considerations.'" *Quintanilla v. Bryson*, No. 6:17-cv-4, 2020 WL 1441405, at *11 (S.D. Ga. Mar. 20, 2020) (quoting *Hewitt*, 459 U.S. at 874 n.9).

Jones contends the stated reasons for his assignment to Tier II were pretextual and false, and Defendants were aware of this.   Jones's factual allegations against Ward and Crickmar regarding his Tier II assignment are discussed above.   Regarding the remaining Defendants, he asserts (1) Jackson, Whitehead, Patterson, and Kegler—as members of the MSP Tier II classification committee—failed to conduct an adequate investigation to determine the truth of the allegations against him; (2) Perry—as Warden of MSP—failed to exercise his independent authority to reject Jones's placement in Tier II, and (3) Nelson—the State Tier Manager—denied Jones's appeals of his Tier II assignment.   4th Am. Compl. 4-5.   Jones also contends the conditions of MSP Tier II were atypical and

imposed a significant hardship compared to MSP general population, citing insufficient out-of-cell recreation, prolonged exposure to sewage due to other inmates clogging their toilets, denial of batteries for his TENS unit and an egg crate foam pad, and other conditions such as restrictions related to meals, property, visitation, phone calls, and access to religious services.  *Id.* at 6-16.

The Court recommends summary judgment be granted to Defendants because Jones can show neither atypical hardship nor denial of due process.  "This Court has held multiple times 'that the conditions within [MSP]'s Tier II facility do not rise to the level of an atypical and significant hardship.'"  *See Bey v. Ga. Dep't of Corr.*, No. 5:19-CV-236-MTT, 2021 WL 3832227, at *1 (M.D. Ga. Aug. 27, 2021) (quoting *Bradford v. Dozier*, No. 5:17-cv-321-TES-CHW, 2018 WL 10534319, at *4 (M.D. Ga. Nov. 28, 2018)); *Maddox v. Owens*, No. 5:15-CV-36-MTT, 2018 WL 1513671, at *8 (M.D. Ga. Mar. 27, 2018).  Ironically, this includes a claim by another ASP inmate transferred to MSP for involvement in the September 4, 2018, disturbance who was housed in Tier II at roughly the same time as Jones.  *See Bey v. Ga. Dep't of Corr.*, No. 5:19-CV-236-MTT, 2021 WL 4258632, at *1-2, 9 (M.D. Ga. July 14, 2021) (finding no atypical hardship for inmate housed in MSP Tier II from September 14, 2018, to October 2, 2019), *recommendation adopted by* 2021 WL 3832227 (M.D. Ga. Aug. 27, 2021).  Despite his efforts to distinguish these cases, Jones has not sufficiently differentiated his circumstances for the Court to reach a different finding here.

Further, even if the conditions of MSP Tier II did impose an atypical and significant hardship, the evidence shows Jones received sufficient due process.  Jones contends the

charges against him were false, and if Perry, Nelson, and the classification committee had performed a proper independent inquiry, they would not have assigned him to Tier II.   4th Am. Compl. 5.   Jones, however, misapprehends the due process to which he was entitled. "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."   *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).   Further, "prison inmates have no constitutionally guaranteed immunity from a false or wrongful accusation of conduct even if the accusation could result in the deprivation of a protected liberty interest."   *Gordon v. Baxter*, No. 5:20-cv-688-LSC-GMB, 2022 WL 453747, at *4 (N.D. Ala. Jan. 13, 2022) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)), *recommendation adopted by* 2022 WL 450815 (N.D. Ala. Feb. 14, 2022).   As long as minimum procedural safeguards are provided, due process is satisfied if "some evidence" supports the prison body's decision.   *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *see O'Bryant*, 637 F.3d at 1214-15 (finding no due process violation where prison officials complied with the hearing procedure requirements of *Wolff* and *Hill* and evidence before the disciplinary panels supported their decisions).   This "is a very low threshold and is met if there is some way to deduce how the disciplinary tribunal's decision was made."   *Keeling v. Schaefer*, 181 F. Supp. 2d 1206, 1223 (D. Kan. 2001); *see Hill*, 472 U.S. at 457 ("Although the evidence in this case might be characterized as meager, . . . the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.").   "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of

witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.

Contrary to Jones's assertion, there was an investigation to support his assignment to Tier II, and he was given the opportunity to present his side of the story.   The day after he arrived at MSP, GDC Inspector Bish conducted a three-hour interview with Jones, and prepared an email summary of the interview.   Bish Decl. ¶¶ 6, 11.   Bish's email summary indicated Jones admitted involvement in a contraband smuggling operation carried out by the same individuals behind the sit-in, preparing the letter-petition at the request of the organizer of the sit-in, and knowing the location of weapons at ASP, which he had apparently chosen not to previously disclose to prison officials.   Bish Decl. pp. 25-26. Moreover, Jones's attitude during the interview—at least as conveyed by Bish's email—is not one of protestation of innocence but of contrition, and the issue put forth to prison official by Jones's statements to Bish was not the propriety of Jones's placement in Tier II but whether they were willing to cut him a deal.   Bish sent his email to various GDC officials, including Crickmar and Robert Toole, who ordered that Jones remain in the Tier II program at MSP.   Crickmar Decl. ¶¶ 8, 12-13; Bish Decl. ¶ 11.   On September 13, 2018, Crickmar relayed this instruction directly to Defendant Perry, the Warden of MSP. Crickmar Decl. ¶ 14, p. 25; Perry ¶ 6.   Pursuant to Crickmar's instructions, the classification committee recommended Jones's assignment to Tier II, and Perry signed his approval on September 14, 2018.   Nelson Decl. p. 27.

Jones argues by the time Bish interviewed him on September 11, 2018, he had

already been placed in Tier II.   Pl.'s Resp. to Mot. for Summ. J. 5.   He also argues the decision to keep him Tier II was unrelated to Bish's email summary, and the classification committee's approval of his Tier II classification on September 13, 2018, was made prior to Toole's email directive that Jones remain in Tier II.   Pl.'s Resp. to Mot. for Summ. J. 29.   He relies on the 7:43 p.m. time stamp on Crickmar's September 13, 2018, email forwarding Toole's instructions to Perry compared to the classification committee's recommendation being made "during the day," though the document he cites does not reflect a specific time for the committee's recommendation.   *Id.* at 7, 29; Perry Decl. pp. 22-23.

There is certainly evidence that when Jones arrived at MSP, he was immediately detained in some form of administrative segregation, though the record is unclear whether it was Tier I or Tier II and whether it was intended to be permanent or until the 96-hour hearing.   Defs.' Resp. to Ct. Order Attach. 3, at 3, ECF No. 182-3; Perry Decl. pp. 25, 27. It is also accurate that Crickmar's email to Perry was sent in the evening, though there is no evidence the classification committee's recommendation was "during the day" since the document cited by Jones does not have a time stamp.   Perry Decl. pp. 22-23.   Regardless, the record is clear the final decision to keep Jones in Tier II "came from up top," as Jones himself admits.   Pl.'s Resp. to Mot. for Summ. J. 7.

This final decision is supported by Bish's email summary.   Jones contends Bish's email summary is not an accurate account of what he told the investigator.   He asserts Bish "condensed, and confused, several separately discussed issues into a few paragraphs."   *Id.* at 3.   However, Jones has never sought to include Bish as a defendant in this case, nor has

he ever alleged Bish intentionally misrepresented his comments.   Further, Jones has presented no evidence of collusion between Bish and other prison officials to manufacture evidence to justify his placement in Tier II.   Therefore, he presents no evidence Defendants and other prison officials would have reason to believe Bish's email was anything other than an accurate summation of Jones's comments to him.   Whether it is in fact an accurate account of what Jones said—and regardless of whether this Court would have found it a sufficient basis to place him in Tier II—it is "some evidence" to support prison officials' decision to keep Jones in Tier II.   It arguably shows Jones's connection to the September 4, 2018, incident and its organizers went beyond simply presenting an after-the-fact letter of grievances, and it provides information of Jones's prior involvement in other illegal activity.[12]   If the Court were to find the decision to keep Jones in Tier II unsupported, it would in effect be forcing prison officials to ignore his admissions to illicit conduct and grant him a form of immunity because his original placement in Tier II was arguably flawed.[13]

---

[12]   Regarding the brief period Jones was arguably held in Tier II without a sufficient factual basis for his placement, "the Supreme Court has determined that administrative confinement for short periods of time does not implicate a liberty interest under the Due Process Clause."   *Whitsett v. Cannon*, 139 F. Supp. 3d 1293, 1303 (M.D. Fla. 2015) (citing *Sandin*, 515 U.S. at 485-87 and *Rodgers v. Singletary*, 142 F.3d 1252, 1253 (11th Cir. 1998)).

[13]   Jones also takes issue with the decision to keep him in Tier II being made by those other than the classification committee.   Pl.'s Resp. to Mot. for Summ. J. 34-35.   There is no constitutional requirement, however, that a final decision on administrative segregation be made by a committee as opposed to an individual prison official.   See *Westefer v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012) ("In other words, only a single prison official is needed as the neutral reviewer—not necessarily a committee.").   The Court further notes that as Director of Field Operations, Toole—or his designee—was responsible for deciding an inmate's appeal of assignment to Tier II.   Nelson Decl. ¶¶ 9-10, p. 11.   Thus, Toole did not exercise authority not granted him under the SOPs.

Following his assignment to Tier II, Jones was then provided with periodic reviews every ninety days, and he was promoted to the next phase each time until he was transferred out of the program. Perry Decl. ¶¶ 9-11. Throughout this time, Jones appealed his placement in the Tier II program, and although he was not able to obtain his early release from the program, his arguments were considered, as demonstrated by his ability to get his "STG G-Shyne" designation removed. Perry Decl. p. 32. Therefore, the Court recommends Defendants be granted summary judgment on Jones's due process claims.

F.    Cell Flooding

Jones asserts a conditions of confinement claim against Perry, Eaddie, McKenzie, Jackson, Pope, Whitehead, and Kegler related to unsanitary conditions while he was housed in Tier II. Specifically, Jones states other inmates in Tier II would clog their toilets during the night shift, causing the cells to flood, and staff would engage in "group punishment" by allowing the sewage to sit overnight instead of ordering the cells cleaned. 4th Am. Compl. 6. Jones does not allege Defendants worked during the night shift and actively participated in the purported group punishment. To the contrary, he asserts they worked the day shift and are thus unable to contradict his contention night shift staff would leave sewage standing. Pl's Statement of Undisputed Facts 13, ECF No. 343-1. He argues Defendants are liable because of their authority over Tier II and their failure to respond to his multiple complaints and grievances. Pl.'s Br. in Supp. of Mot. for Summ. J. 7-8, ECF No. 343-6   On those occasions sewage was left overnight, Jones reports the day shift was "good" about cleaning when it arrived. Hr'g Tr. 76, 132.

To establish a conditions of confinement claim, a plaintiff must satisfy three

elements. *Saunders v. Sheriff of Brevard Cnty.*, 735 F. App'x 559, 564-65 (11th Cir. 2018) (per curiam). The first element is "an objective hurdle, where a [plaintiff] must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Id.* at 564 (quotation marks omitted). The "violation must be extreme and deprive the prisoner of the minimal civilized measure of life's necessities." *Id.* The second element is subjective, requiring the plaintiff to show the defendant acted with "deliberate indifference." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). "[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (internal quotation marks and citation omitted). Third, and finally, a plaintiff must establish "a causal connection between the defendant's conduct and the Eighth Amendment violation." *Saunders*, 735 F. App'x at 564-65.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones," and a prisoner may subject the conditions under which he is confined "to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). Further, "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *Brooks v. Warden*, 800 F.3d 1295, 1304 (11th Cir. 2015) (quoting *Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)). Thus, prolonged exposure to raw sewage can state an Eighth Amendment claim. *See id.* (collecting cases). In evaluating whether such exposure satisfies the objective component of the conditions of confinement analysis, "the

frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered[.]"   *Grimes v. Thomas*, No. 2:12–cv–01909–LSC–JHE, 2014 WL 554700, at *7 (N.D. Ala. Feb. 12, 2014) (citing *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978)).

The record is not clear as to how often inmates would flood the toilets during the night shift or how long the sewage would remain.   The parties agree the inmates "routinely" or "regularly" flooded their cells, and Jones alleges "group punishment [was] a weekly occurrence."   4th Am. Compl. 7.   Jones has provided a list of specific dates when he said flooding occurred, though it is not clear if this is intended to be a comprehensive list of flooding incidents or simply examples.   Pl's Mot. to Suppl. 5, 7-8, ECF No. 217.   Jones also contends there were occasions when the Tier II cells remained flooded for up to twenty hours, though he says the average was fifteen to sixteen hours. 4th Am. Compl. 6; Pl.'s Br. in Supp. of Mot. for Summ. J. 8.   He presents no evidence to support this figure, though, and the Court is not going to assume it is accurate in light of his concession day shift was "good" about beginning the clean-up process when it arrived, each shift was twelve hours, and his figure would require that inmates flooded their cells immediately upon the night shift coming on duty.   Hr'g Tr. 76, 132; Pl.'s Resp. to Defs.' Statement of Facts 19.   Defendants have submitted affidavits stating sewage was not allowed to remain standing during the night shift, though it would sometimes take a few hours for orderlies to be summoned to Tier II to clean up the cells because—unlike the day shift—they were not otherwise present in the unit at night.   *See*, *e.g.*, Perry Decl. ¶ 14; Hr'g Tr. 77-78.   Of course, on summary judgment, the Court must assume Jones's

contentions are true and night shift allowed sewage to remain standing without bringing in orderlies to clean.

Here, the Court concludes the conditions shown were not sufficiently serious to violate Jones's constitutional rights. Even assuming sewage was left to stand overnight, the undisputed evidence shows the day shift was "good" about beginning the clean-up process when it arrived. The Court is not aware of any binding authority which draws a hard line at when prison officials must begin cleaning. Further, the Court is not going to conclude the Constitution requires immediate clean-up when the cause of the flooding is active sabotage by inmates—raising the question of whether immediate clean-up is even practical—and the parties agree cleaning the sewage requires bringing in orderlies and sometimes, as Jones himself points out, maintenance personnel to unclog the sewage line. Pl.'s Resp. to Defs' Statement of Facts 19.

In summary, the situation presented here—where sewage was cleaned the next morning—is far short of the extreme conditions found to constitute a constitutional violation. *See Taylor v. Riojas*, --U.S.--, 141 S. Ct. 52, 53 (2020) (finding it constitutionally impermissible to leave an inmate housed for four days in a cell "covered, nearly floor to ceiling, in massive amounts of feces: all over the floor, the ceiling, the window, the walls, and even packed inside the water faucet." (internal quotation marks omitted)); *Brooks*, 800 F.3d at 1303 (finding a constitutional violation when inmate was bound in waist-chains and forced to defecate in his jumpsuit and sit in his own feces for two days); *Saunders*, 735 F. App'x at 568 (finding it constitutionally impermissible when inmates would urinate, defecate, and ejaculate on cell floors and walls and the staff would

not clean the waste for "days"); *DeSpain*, 264 F.3d at 974 (exposure to flooding conditions for thirty-six hours was a constitutional violation).   Having concluded the conditions Jones alleges fail to satisfy the objective component of the conditions of confinement analysis, the Court need not address the subjective component, including whether Defendants can be held liable based on supervisory liability.[14]

> G.   Out-of-cell Recreation

Jones also asserts a conditions of confinement claim for denial of out-of-cell recreation.   4th Am. Compl. 8-9.   "In some cases, allegations of a denial of out-of-cell recreation for an extended period of time will support an Eighth Amendment claim." *Kerch v. Johnson*, No. 5:17-CV-108-MTT-CHW, 2017 WL 8813080, at *3 (M.D. Ga. July 21, 2017), *recommendation adopted by* 2018 WL 844416 (M.D. Ga. Feb. 13, 2018).   Jones contends despite GDC SOPs requiring a minimum of five hours per week of out-of-cell exercise, he was only given out-of-cell recreation twenty-four times between September 17, 2018, and June 2, 2019.[15]   Pl.'s Statement of Undisputed Facts 15.   The record

---

[14]   The Court notes, however, Jones has presented no direct evidence any member of prison staff—Defendants or otherwise—allowed sewage to remain standing as a form of group punishment.   He cites no statements by any member of staff to support this contention, and the Court can find no such evidence in the record.   Moreover, the fact the day shift was diligent about cleaning indicates there was no prison policy of "group punishment."   Instead, Jones infers such motivation simply from the fact night shift did not bring in orderlies to clean.   Pl.'s Resp. to Defs' Statement of Facts 23.   But along with the factors already discussed which made clean-up during the night shift challenging, Jones himself cites the prison logbooks to highlight occasions when the night shift was understaffed, or staff felt it was too dangerous to go onto the floor.   *Id.* at 20-22.

[15]   As the Court has previously explained to Jones, violations of prison policies do not equate to constitutional violations.   *See Hutchins v. Myers*, No. 2:16-CV-324-WHA, 2019 WL 2169211, at *9 (M.D. Ala. Apr. 24, 2019) ("The law is well-settled that infringements of agency rules, regulations, policies or procedures do not, without more, amount to constitutional violations."),

demonstrates, however, that Jones also had the opportunity to exercise inside of his cell, and inmates are provided pamphlets for that purpose. *See* Defs.' Resp. to Ct. Order Attach. 2, ECF No. 182-2; Perry Decl. ¶ 21.[16]  Further, Jones's recreation opportunities were limited only for the nine-month period he was in Tier II.

Under these circumstances, the Court recommends Defendants be granted summary judgment. *See Bass v. Perrin*, 170 F.3d 1312, 1317 (11th Cir. 1999) (concluding "the complete denial to the plaintiff of outdoor exercise" to an inmate from October 1989 to May 1992, "although harsh, did not violate the Eighth Amendment" where the inmate was able to exercise inside of his cell and was provided with a booklet for that purpose); *Anthony v. Warden*, 823 F. App'x 703, 708 (11th Cir. 2020) (per curiam) (finding no Eighth Amendment violation for a plaintiff held in administrative segregation for six months where he "was neither totally deprived of outdoor exercise nor prevented from exercising in his cell"); *Bey*, 2021 WL 4258632, at *11 (finding no Eighth Amendment violation for denial of out-of-cell recreation to an inmate held in MSP Tier II during the same time Jones was incarcerated there); *Lawrence v. Pecore*, No. 3:20-cv-00055-CAR-CHW, 2022 WL 3129601, at *4 (M.D. Ga. July 15, 2022) (finding no Eight Amendment violation for an inmate allowed only three fifteen-minute periods of out-of-cell time each week for out-of-

---

*recommendation adopted by* 2019 WL 2163610 (M.D. Ala. May 17, 2019); *Sandin*, 515 U.S. at 481-82 (noting that prison regulations were "primarily designed to guide correctional officials in the administration of a prison" and were "not designed to confer rights on inmates").

[16]  In his briefing, Jones refers to ECF No. 181, but that document was rejected as deficient because it was not in a text-searchable pdf format.  It was replaced by ECF No. 182, which is otherwise identical to ECF No. 181.   The Court provides this explanation so that Jones will know why it is citing to ECF No. 182.

cell activities), *recommendation adopted by* 2023 WL 3611552 (M.D. Ga. May 23, 3023).

> H.   Serious Medical Need

Jones contends Perry, McKenzie, Eaddie, and Schofill were deliberately indifferent to a serious medical need.   Specifically, Jones alleges he had a herniated disc for which he had been prescribed a TENS unit, but Defendants would not allow him to have batteries for the TENS unit while he was in Tier II.[17]   4th Am. Compl. 10.

"The [E]ighth [A]mendment, which applies to the states through the [F]ourteenth [A]mendment prohibits the infliction of cruel and unusual punishment . . . .   [S]tates violate the [E]ighth [A]mendment if they are deliberately indifferent to a prisoner's serious medical needs."  *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1571-72 (11th Cir. 1985) (internal citations omitted).   To prove a claim of deliberate indifference, "a plaintiff must show: (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam).

The first prong is an objective inquiry, requiring the plaintiff to prove "an objectively serious medical need."  *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022).   "A serious medical need is one that has been diagnosed by a physician as

---

[17]   Jones has also alleged he was denied an eggcrate foam pad while in Tier II.   4th Am. Compl. 10.   However, his references to the pad have largely been in passing, and his focus has clearly been on batteries for the TENS unit.   He does not even mention the eggcrate foam pad in the argument section of his response brief.   Pl.'s Resp. to Mot. for Summ.   J. 41-43.   Therefore, to the extent Jones intended to pursue a separate claim related solely to the pad, he appears to have abandoned it, and the Court recommends Defendants be granted summary judgment on this aspect of his claim.

mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.   In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Dang ex rel. Dang v. Sheriff*, 871 F.3d 1272, 1280 (11th Cir. 2017) (internal quotation marks and citations omitted).

The second prong is a subjective inquiry.   *Ireland*, 53 F.4th, at 1287.   To establish deliberate indifference to a serious medical need, a plaintiff must prove: "(1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the official actually drew that inference, (3) the official disregarded the risk of serious harm, and (4) the official's conduct amounted to more than gross negligence." *Id.* (internal quotation marks omitted).

The Court recommends Defendants be granted summary judgment.   While there is no dispute Jones had a serious medical need in the form of a herniated disc causing back pain, there is no evidence any of the Defendants were deliberately indifferent to the need. According to Jones, a medical provider told him Eaddie said he could not have batteries while in Tier II, and in fact, Eaddie confirms inmates in Tier II were not allowed batteries until they reached phase three of the program.   Eaddie Decl. ¶ 15.   Because he could not have batteries, Jones was effectively denied use of the TENS unit while in the Tier II cells. To the extent Jones seeks to hold Defendants liable solely because they denied him use of the TENS unit in Tier II, though, "[n]ot providing a therapeutic device that is prohibited within the prison does not amount to a deliberate indifference to Plaintiff's medical needs." *McCoy v. Prison Health Servs.*, No. Civ. A.L–01–1498, 2003 WL 24012158, at *6 (D. Md. Mar. 25, 2003) (finding no deliberate indifference for denying an inmate a TENS unit for

pain relief).

The issue in this case is not specifically the batteries but whether Defendants were deliberately indifferent to Jones's back pain and treatment prescribed to ease it.   There is no evidence they were.   While he was barred from using the TENS unit in Tier II, Jones presents no evidence that any of the Defendants otherwise prevented him from using the TENS unit by, for example, going to the medical unit to use it.   In fact, beginning in late March, Jones started sending letters to Perry and Schofill—MSP's Health Services Administrator—demanding that he be taken to the medical unit three to five times each day for an hour each time to use the TENS unit because that was "the only other option" in lieu of being allowed batteries in Tier II.[18]   Pl.'s Mot. for Summ. J. Attach. 4, at 5, 343-4; Schofill ¶ 3, ECF No. 337-14.   According to Jones, this never happened despite Perry instructing Pamela Maxie—the Director of Nursing—to discuss his letter with him and take "necessary action."[19]   Pl.'s Mot. for Summ. J. Attach. 5, at 1, ECF No 343-5.   Again, though, there is no evidence Defendants were responsible for him not going to the medical

---

[18]   According to Schofill, his role at MSP was "strictly administrative," and he "had no authority to make medical treatment decisions regarding inmates."   Schofill Decl. ¶ 4.   His employment at MSP ended on March 19, 2019, which is when Jones began sending letters asking to be taken to the medical unit to use his TENS unit.   *Id.*; 4th Am. Compl. 11.

[19]   Perry did not instruct Maxie to arrange for Jones to be brought to medical three to five times daily as his letter demanded but only to meet with him and take "necessary action."   Pl.'s Mot. for Summ. J. Attach. 5, at 1.   The summary of the "matter discussed" states Jones was to bring his TENS unit to medical once a month to have the battery changed, not that he could use the TENS unit in the medical unit.   *Id.*   At this point, Jones had been assigned to phase III of Tier II, where, according to policy at least, he was allowed to have batteries.   Perry Decl. ¶ 10; Schofill Decl. ¶ 5.   Jones denies ever being brought to the medical unit for this discussion and states he was unaware of Perry's memo until he received a copy in discovery.   4th Am. Compl. 11.   He also states he was never brought to the medical unit to change his battery.   *Id.*

unit, and Perry's response explicitly shows he was not indifferent to Jones's concerns.

Jones is frustrated by what he calls the "blame game," where different prison employees believed someone else was responsible for addressing his concerns.   4th Am. Compl. 10.   But "'bureaucratic misunderstandings' do not rise to deliberate indifference." *Jamison v. U.S. Marshal's Serv.*, No. 5:19-cv-457-TES-MSH, 2023 WL 2050022, at *7 (M.D. Ga. Feb. 16, 2023) (quoting *Burley v. Upton*, 257 F. App'x 207, 210 (11th Cir. 2007)).   Based on the record before the Court, the most that can be concluded is someone may have dropped the ball by not being more proactive to accommodate Jones's need for a TENS unit.   However, negligence—even gross negligence—is insufficient to establish deliberate indifference, and Jones has failed to prove Defendants "prevented his access to [the TENS unit] to inflict more pain or punishment."   *Id.* at *7 (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (noting that "only the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment")).   Moreover, the record as a whole establishes prison officials were not indifferent to Jones's pain, providing him with treatment at an outside pain management clinic and prescriptions for pain medication.   Schofill Decl. ¶ 8.

I.   Damages

Defendants argue Jones is barred from recovering compensatory damages because he can prove no more than *de minimis* injuries.   Defs.' Br. in Supp. of Summ. J. 33-35. The PLRA states that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]"   42 U.S.C. § 1997e(e).   In the absence of physical injury, a plaintiff is precluded from recovering compensatory damages

against a defendant.  *See Hoever v. Marks*, 993 F.3d 1353, 1358 (11th Cir. 2021).   Jones argues he suffered a physical injury "as a result of his confinement in Tier II segregation." Pl.'s Resp. to Mot. for Summ. J. 45.   He cites "extreme nerve pain" resulting from not being allowed to have batteries for his TENS unit.  *Id.*   He also cites "heat rashes" due to the lack of ventilation in Tier II during the summer, hunger from small food portions, and stress-related symptoms such as sleep deprivation, headaches, and hypertension.  *Id.* at 45-46.

The Court need not decide whether Jones's alleged physical injuries would satisfy the PLRA because they all stem from his placement in Tier II.   As discussed above, the Court has found his due process rights were not violated by his placement in Tier II.   The only claim the Court recommends going forward is his First Amendment retaliation claim. Regarding this claim, Jones is entitled to pursue nominal and punitive damages.  *Hoever*, 993 F.3d at 1364.

## II.    Plaintiff's Motion for Summary Judgment

Jones has also moved for summary judgment on each of his claims (ECF No. 343). As discussed above, the Court has determined Defendants are entitled to summary judgment on each of Jones's claims except for his retaliation claim against Ward, so the Court recommends Jones's summary judgment motion on those claims be denied.   As for the retaliation claim against Ward, Jones himself admits summary judgment is "particularly inappropriate" when "the underlying issue is one of motivation, intent, or some other subjective fact."   Pl.'s Resp. to Mot. for Summ. J. 17 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1324 (11th Cir. 2011) (Korman, J., dissenting)).

Here, while the Court has denied Ward summary judgment, there is still a disputed issue of fact as to whether his subjective motivation was to punish Jones for exercising his First Amendment rights as opposed to genuinely—even if mistakenly—believing Jones had played a part in the ASP disturbance.   Thus, the Court also recommends Jones motion for summary judgment on this claim be denied.

## III.   Plaintiff's Motions for Spoliation Sanctions

Jones has filed motions (ECF Nos. 328, 333) seeking spoliation sanctions over certain documents he alleges Defendants or other GDC officials intentionally destroyed. The documents in question are the original letter-petition he handed to Ward and the Tier II logbook entries, including entries from January 17, 2019, through May 1, 2019.[20]   Pl.'s 2d Mot. for Spoliation Sanctions 2, 8, ECF No. 333.   The last known person to have the letter was Inspector Bish because he indicated he would attach a copy to his email summary, though it is not clear if it was actually attached.   Bish Decl. p. 25.   Defendants have not been able to account for the missing letter and logbook entries except to say they could not be located.

As a sanction for failing to produce is original letter-petition, Jones requests the Court order a factual finding that the copy of the letter he has placed in the record is an accurate replica of the one he handed Ward.   Pl.'s 1st Mot. for Spoliation Sanctions 4,

---

[20]   In an affidavit, Crystal Hendley, Assistant General Counsel for the Office of Legal Affairs for GDC, stated the logbooks for February and March 2019 could not be located.   Hendley Decl. ¶ 9, ECF No. 182.   The Court has examined the logbooks produced and found a gap from mid-January until one entry on April 24, 2019, and then picking up again on May 1, 2019.   Defs.' Resp. to Ct. Order Attach. 4, at 271-74, ECF No. 182-4.

ECF No. 328.   Regarding the logbook entries, Jones states he is prejudiced because they would show sewage was left overnight and out-of-cell recreation was not provided.   Pl.'s 2d Mot. for Spoliation Sanctions 9.   As a sanction, therefore, he requests a factual finding the cells flooded on the specific dates he has identified, orderlies were not summoned to clean up sewage during the night shift, and out-of-cell recreation was rarely offered.   Pl.'s 1st Mot. for Spoliation Sanctions 8.   He also wants a jury charge on spoliation.   *Id.* at 10.

The Court previously denied Jones's request for sanctions related to the missing documents (ECF No. 327), though without explanation.   It is important to note the Court's concern up until now has simply been to resolve discovery issues, which means ensuring discoverable documents that still exist and can be located are produced.   As such, it has approached the issue of sanctions solely under Rule 37 of the Federal Rules of Civil Procedure.   Rule 37 grants courts the authority to impose sanctions on parties that do not comply with discovery obligations, including Court orders to produce discovery.   Fed. R. Civ. Proc. R. 37(b), (c).   The Court is satisfied, especially in light of GDC counsel's involvement in attempting to locate documents, that discoverable information that still exists and can be located has been produced.[21]

Jones's request for spoliation sanctions, though, raises a different matter, which is the destruction or failure to preserve evidence in "pending or reasonably foreseeable

---

[21]   Of course, the Court cannot search through the parties and GDC's documents personally, so, as with most discovery, it relies on the parties and counsels' integrity and understanding of the consequences of making false statements to the Court.   Again, while not performed as expeditiously as the Court would have expected, there is no evidence parties and counsels' efforts to comply with their discovery obligations has been insincere.

litigation." *Alston v. City of Darien*, 750 F. App'x 825, 835 (11th Cir. 2018) (per curiam) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).   The source of the Court's power to impose sanctions for such destruction arises under Rule 37(e) for electronically stored information and its inherent authority to sanction discovery abuses.   *See* Fed. R. Civ. P. 37(e) (outlining a district court's authority to sanction a party's failure to preserved electronically stored information "that should have been preserved in anticipation or conduct of litigation"); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("We have long acknowledged the broad discretion of the district court to impose sanctions. This power derives from the court's inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases.").

To establish spoliation, the burden is on the party moving for sanctions to show (1) "the missing evidence existed at one time;" (2) "that the alleged spoliator had a duty to preserve the evidence;" and (3) "that the evidence was crucial to [the plaintiff's] case." *Stanfill v. Talton,* 851 F. Supp. 2d 1346, 1362 (M.D. Ga. 2012).   If this is shown, the Court must then consider whether to impose sanctions after considering "(1) whether the movant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the alleged spoliator acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence is not excluded." *Id.* (citing *Flury*, 427 F.3d at 945).   Possible sanctions for spoliation include: "(1) dismissal of the case [or default judgment against the defendant]; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Flury*, 427 F.3d at 945.

The Court has not addressed whether spoliation occurred and whether sanctions would be appropriate because it has not needed to do so.   This includes consideration of Defendants' summary judgment motion because the Court has presumed (1) the version of the letter submitted into the record by Jones is an accurate reproduction of the one he presented to Ward, (2) flooding occurred on the dates alleged by Jones, (3) night shift did not summon orderlies to clean the sewage when flooding occurred, and (4) out-of-cell recreation was rarely offered to Jones.   In other words, the Court has—for summary purposes—largely made the factual findings requested by Jones in his motions.   *See* Pl.'s 1st Mot. for Spoliation Sanctions 4, 8.   To the extent Jones requests sanctions at trial for spoliation, including a jury charge, that is a matter best addressed in a pre-trial motion after further briefing by the parties.   Therefore, Jones's motions for spoliation sanctions are **DENIED WITHOUT PREJUDICE** to raise them again prior to trial.[22]

## CONCLUSION

For the reasons explained above, it is recommended that Defendants' motion for summary judgment (ECF No. 337) be denied as to Defendant Ward on Jones's retaliation claim but otherwise granted.   Jones's motions for sanctions (ECF Nos. 328, 333) are denied without prejudice.   It is recommended Jones's motion for summary judgment (ECF

---

[22] One concern the Court has is whether spoliation sanctions are appropriate against Defendants who may have had no ability or responsibility to ensure preservation of documents.   For example, some of the current Defendants are no longer even employed by GDC.   Further, Ward, who would be the lone Defendant if the Court's recommendation is adopted, was apparently not the last person to possess the letter-petition because Bish referenced possessing it in his email summary of Jones's interview.   In deciding whether to impose spoliation sanctions, the Court would have to take this into consideration.   *See Pettit v. Smith*, 45 F. Supp. 3d 1099, 1108-11 (D. Az. 2014) (addressing the imputation of spoliation sanctions against a party not responsible for the destruction of evidence).

No. 343) be denied.   Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, within **FOURTEEN (14) DAYS** after being served with a copy hereof.   Any objection should be no longer than **TWENTY (20) PAGES** in length.   The district judge shall make a de novo determination of those portions of the Recommendation to which objection is made.   All other portions of the Recommendation may be reviewed for clear error.

The parties are hereby notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

SO ORDERED and RECOMMENDED, this 31st day of July, 2023.

/s/ Stephen Hyles
UNITED STATES MAGISTRATE JUDGE